Alright, Mr. Garrett, you may begin. May it please the Court, my name is Alan Garrett and along with other attorneys from Kilpatrick Townsend, I represent Jamil Alamin. Mr. Alamin seeks reversal of the District Court's denial of his federal habeas petition which challenged his Georgia State Court conviction in 2002 for crimes arising out of the March 2000 shooting death of Deputy Sheriff Ricky Kinchin and the shooting of Deputy Sheriff Algernon English. During closing arguments, the prosecution engaged in an extended and deliberate violation of Mr. Alamin's Fifth Amendment rights. Every reviewing court from the Georgia Supreme Court in the direct appeal, the magistrate judge, and the District Court judge has agreed that this was a constitutional error. The District Court judge further emphasized the intentional and egregious nature of the error, describing it as repeated, blatant, and central to the closing argument. The District Court further confirmed that the instruction given by the trial court after multiple objections by Mr. Alamin's attorney was not curative, that it instead exacerbated the problem. She characterized the instruction as not strongly worded and failed to admonish the prosecution for the blatant nature of the violation. So we have a deliberate violation that was not cured by an error. Furthermore, the state continued the improper mock cross after the instruction and then returned to it in rebuttal, ultimately closing its rebuttal with another improper comment, don't stand for him, which was a commentary on his remaining seating during the proceedings, a decision that was approved by the court and religiously based. Do you concede that had the questions been phrased as an attack on the defense without specifically directing or pointing to the defendant and asking him for an explanation, that that would have been proper in closing argument? If the entire procedure had been reformulated to strictly comply with that demarcation, it would be a very different case. Here there was a there was a preprinted board, and I'm sorry I omitted that where we understand that. And then they changed the word from defendant to defense. But they didn't change all the questions, which nor did they change the closing argument. It continued with the questions directed specifically to Mr. Alamin individually. Well, well, the Georgia Supreme Court agrees with you that there is an error of constitutional magnitude, but it's harmless beyond a reasonable doubt. Why isn't it harmless if we have, in this case, the physical evidence from Whitehall, Alabama? And we also have an in-court identification by, I believe it's Deputy English, who identifies Mr. Alamin as the person who committed the crime. That's pretty, that's pretty difficult to overcome, isn't it? Your Honor, you are correct that there was a harmless error beyond a reasonable doubt determination by the Georgia Supreme Court. That represented a clearly erroneous determination of state law according to both the magistrate judge and the district court here. And that's an But you got to address harmlessness. Why is that a harmful error? I agree, Your Honor. And the reason the Georgia Supreme Court's ruling was a misapplication of Chapman v. California is because the evidence that you recited is evidence favorable to the prosecution. But there was evidence supporting acquittal on direct, on these precise issues. But the district court applying the correct standard came to the same conclusion that the error was harmless. So why is that wrong? There are two different tests. The first is the Georgia Supreme Court's application of Chapman v. California. The district court and the magistrate judge determined that was a clearly erroneous decision because they relied solely on the evidence favoring the prosecution and ignored the defense evidence. So that decision has not been cross-appealed. That's not at issue here. There's the separate federal habeas standard of harmless error under Brecht. And what the district court said is while you've shown a clearly erroneous application of Chapman, you have not satisfied the separate federal habeas harmlessness standard, which is more rigorous, of Brecht. In that regard, I think the district court committed two errors. The first error is that the court segregated the crime scene evidence from the White Hall evidence. And the effect of this is essentially to ignore Al-Amin's best acquittal evidence. That acquittal evidence included extensive evidence that both deputies thought that they had shot the assailant. A blood trail, the FBI had a medic on hand to document Al-Amin's injuries when he was arrested. There's a lot of evidence that the assailant had been shot that night. Well, wasn't he wearing a bulletproof vest when he was arrested? He was. He could have been shot and the bullet could have not pierced the bulletproof vest. But there's no evidence that the vest had been shot and there's no evidence of bruising that normally would attend being shot while wearing a bulletproof vest. There's also no evidence whatsoever linking Mr. Al-Amin to the guns, which was the evidence that the district court focused on in making her Brecht determination. Other than they were found in the woods where he was fleeing, pursuing officers. That is correct. The guns were found in the vicinity of his arrest, after his arrest, not while the dogs were following him. Besides the bulletproof vest, I mean, there was pretty clear evidence of flight, was there not? I mean, he had $1,000 in cash. He ditched his cell phone. He was basically on the run. Mr. Al-Amin did address these questions in the state habeas. And he explained the reason that he left Alabama. He explained he thought the attack was directed towards him because of a confrontation he had had earlier that day. He explained why he went to Alabama. That doesn't explain why he's running from the police in Whitehall. I understand his habeas testimony to explain why he fled the neighborhood where the shooting of the deputies occurred. But this is four days later when he's encountered by deputy U.S. marshals and FBI agents who are engaged in the manhunt. And here it's the issue of whether the man in the woods, quote, as described by the agents and residents of Whitehall, shot first or whether the federal agent shot first. And according to the testimony of the residents, the agent shot first. And so you have an individual who's being fired upon by federal agents. What's the explanation? And this is what troubled the district judge in this case. What's the explanation for the bullet holes in his black Mercedes? And I guess the shots matched the gun that was alleged to have committed the crime. What's the explanation for that? There, Mr. Ellamy has never disputed that his gun was at the scene when the crime occurred. That is, he had admitted that at the state habeas. That's not disputed. But it's still entirely circumstantial. I thought he made an argument that the gun was planted. There is, with the guns, it is that the guns were planted. FBI agent Campbell is a central part of that. There is also testimony about another man in the woods that was emphasized by defense counsel in closing arguments. Well, let me just read for you from the district court's opinion. Mr. Ellamy simply has no reasonable explanation for how this evidence got to Whitehall. His claim that the weapons were planted by a rogue FBI agent is not credible, given the lack of supporting evidence for that assertion. To believe this argument, the court would have to assume that the FBI somehow acquired the weapons from the real perpetrator at the scene of the crime or elsewhere without disclosing that fact to Atlanta police and then transport the weapons across state lines to drop them in Alabama woods. Why isn't that persuasive? Two reasons, Your Honor. Number one, that the burden, she's placing the burden on Mr. Ellamy to explain the evidence. And that's essential. Stephen's concurrence in Brecht, the 11th Circuit and Bonner v. Holt confirmed that the burden remains on the prosecution. Secondly, the question is not whether the district court, had it been the fact finder, had it been a juror, would have decided to convict Mr. Ellamy. The question is whether this jury that heard everything this jury heard could have had a reasonable doubt about whether he did it. And if the district court has a grave doubt about whether Mr. Ellamy did it, habeas relief could be granted. But the district court described that evidence as weighty, which is the same term that the Supreme Court employed in Brecht when it denied habeas relief in that case. So how did the district court err in its Brecht analysis? I think there's a couple of things going on there as well. Number one, if you look at cases, you look at Brecht itself, you look at cases applying Brecht, you're not looking at the state's evidence in isolation. You're considering it in the context of the constitutional violation. And here, I mean, this is an unusual habeas case. We have a constitutional violation. Everybody agrees. It's egregious. It's terrible. It wasn't cured. The question of what kind of evidence, what the level of evidence to overcome that, I think is very important. And every court that's dealing with an egregious error, and Gongora, the Fifth Circuit decision, I hope I'm pronouncing it correctly, that is a very similar case. It's also improper commentary on the right to remain silent during closing argument, overwhelming evidence. If you have a technical error where maybe evidence comes in that shouldn't have, but it was basically cumulative or duplicative, then maybe weighty is enough. I further submit that the evidence here is not weighty. Again, if you look at the totality of the record, certainly more than sufficient crime scene evidence he didn't commit the crime. All right. I'm going to ask the clerk to give you four more minutes because you've not addressed the Sixth Amendment violation. All right. I agree with you that the Fifth Amendment claim is the stronger claim, which is the one you seem to have focused on first. But I want to give you four more minutes because I want to hear what you have to say about the Sixth Amendment, the alleged Sixth Amendment violation. Yes. Well, this is an unusual Sixth Amendment claim because in your typical Sixth Amendment claim, it's the confrontation of a witness who's critical to the state. And really, Ron Campbell was a witness that was critical to Mr. Al-Amin's defense. So this in and of itself makes it an unusual claim. There are very unusual facts about Mr. Al-Amin that were presented in the state court record. He traveled alone from Alabama to Montgomery. He did not travel with a group. He requested to go there. He was separated from the group. That evidence is clear from the record. The night before the arrest, he was caught lying on cross-examination about crossing the fence where the gun ultimately was found. He testified indirect that he was alone, I mean, that he was with others. But then when cross-examined about it, he admitted he was alone. And that is where the pistol is found. So where did he find the AR-15 and the 9mm? I'm back to Judge Wilson's question. You'd have to believe that Agent Campbell somehow found at the scene of the original shooting the weapons that were used in shooting the two officers, which apparently were totally missed by the local officers, and then carried them to Whitehall, Alabama, and planted them in the woods. And the district court had a hard time believing that that was likely to have occurred. That's a fair question. There is evidence, and Paula, I'm sure, will confirm the correctness of this, that Blue Jackets FBI agents were on the scene the night of the crime. The West End, right? That is correct. And then, you know, Mr. Allamy, I recognize talking about planting guns will give every judicial officer heartburn. I recognize that. But these are not just drop guns that we've seen in other cases that are untraceable. These are guns that were traced by ballistics to the rounds that were recovered during autopsy from the deceased officer and from the hospital when engaging in surgery on the wounded officer, and matched with the bullets that were recovered from the shot up black Mercedes owned by your client. I mean, if Agent Campbell was able to orchestrate all that, he must have had pretty good power. Well, Your Honor, all he had to do was move the guns from point A to point B. The guns. That's the question. Not just an untraceable gun that gets dropped at the scene where the police officer may have shot an unarmed man. Well, and you're hearkening now to the subjects of the cross-examination. Right. But no evidence, there's no documentary evidence, there's nothing. Mr. Allamy was under FBI surveillance, okay, and there was no, before the crime, and there is no evidence that linking him to these guns whatsoever. No physical evidence at all. And then the second thing is that, you know, the guns were tested by Bernadette Davey. It's amazing that this case manages to touch sort of every issue of complicated procedure. She was fired for not doing enough tests, and so that all happened years after this case. But the ballistics expert was fired for not doing her jobs, who linked these guns to that. But having said that, again, there's no dispute his car was there the night of the crime. That's not disputed. But what the Georgia courts did with this is it applied a Georgia rule of evidence. Mr. Campbell was investigated, and he was cleared of any wrongdoing with regard to the prior allegations. In Georgia, you can't impeach a witness unless the alleged misconduct resulted in a crime of moral turpitude. What do we do with that? This is not an attempt to impeach him based on a crime of moral turpitude. This is an effort to show similar conduct, bent of mind, which if you were a defendant in Georgia— What's the difference? It's 404B. You know, you're not just trying to show this is a bad person. You're trying to show action in conformity with prior conduct in the incident in question. And if the shoe was on the other foot, Georgia law— Well, what the defense attorney was attempting to do was to show that he's been accused of planning evidence before. Correct. And so, therefore, he might have a tendency to do it again this time around. Correct. And what the trial court decided was that based on Georgia law, if you're cleared of it— Georgia law is clear that if you're cleared of it and you're not convicted, you can't cross-examine on that basis, right? So, I mean, don't we owe some deference to Georgia law? That rule applies when you're solely trying to bring in the crime of moral turpitude to infect the credibility of the witness. And that's not what the defense attorney was attempting to do in this case? He was trying to get the evidence in, a similar transaction evidence, to show that the witness had acted in conformity with prior conduct, not just that he engaged in a dishonest conduct and, therefore, can't be trusted today. Okay. I got you. All right. Thank you. You've reserved some time for rebuttal, and we'll hear from Ms. Smith. Please excuse the court. I'm here today on behalf of the state, urging the court to affirm the district court's denial of relief. And as the court is aware, we've discussed both issues in the case, whether the prosecutor's closing argument was harmless error under the Brecht test, because we are now in federal court, and then whether there was an impermissible restriction on his right to confront FBI agent Campbell. Turning to the first issue, we submit that the district court properly concluded that under Brecht, the error was harmless under the facts of this particular case. We have discussed, and the district court discussed, the distinction between the standard of review that a state court would apply on direct appeal, which is the Chapman standard, which looks to whether the error is harmless beyond a reasonable doubt, and now in Brecht and the O'Neill case and Frye, which all make clear that there's no point in this court conducting the same analysis. Instead, you look to see whether the error had a harmful or injurious effect, and there is no burden of proof upon either party anymore, contrary to what opposing counsel said this morning. The O'Neill case replaced any sort of presumptions or burden with the grave doubt standard and said, let's just go right to the heart of the matter. If the court has grave doubt as to whether the error was harmful, then that carries the day the petitioner wins. Applying the standard, and which the district court could have done from the outset, as we pointed out, your precedent has said so in Mansfield, because the Supreme Court has made clear that the Brecht standard subsumes the deference due to a state court's decision under 28 U.S.C. section 2254 D.1, as well as the Chapman standard. Well, let me ask you this. A prosecutor cannot comment on a criminal defendant's failure to testify. That's true, right? That is correct, Your Honor. But he can if the evidence is overwhelming. Well, in this case, the Georgia Supreme Court didn't quibble with whether he did or didn't. Georgia law, and we pointed out a case from this court, one can comment on the failure of either party to present certain evidence. And while the prosecutor initially said questions for the defendant, the chart was rephrased and he did go to questions for the defense. Still, the Georgia Supreme Court— How do we discourage prosecutors from commenting on a defendant's failure to testify if he's got enough other evidence in the case to convict the defendant and he can go forward? What's the remedy? Well, that's not—we're not here on a claim of prosecutorial misconduct, per se. We're here on a Fifth Amendment claim where Mr. Al-Amin's rights violated. And case law has made very clear that while the actions of a prosecutor, the argument itself may be improper and you may have intentional misconduct, that without more doesn't carry the day. You still have to look— What if it's repeated and it's blatant and it's egregious? Can we then say even in the face of overwhelming evidence that that constitutes a Fifth Amendment violation? I would say not yet, Your Honor. I will acknowledge I think it may have been Brecht itself. There's a footnote in which the court said we're reserving that question, but the Supreme Court has never gone back and addressed that. In all the cases that we have both cited, still you don't divorce the prosecutor's conduct from the weight of the evidence itself. Brecht itself says look at the comments, look at whether there was a curative instruction, look at the weight of the evidence. And as Judge Tallman pointed out, the district court— But it was egregious in this case, wasn't it? I would submit it is not as egregious as in the Hill case upon which the Petitioner relied where you had a motion in limine granted prior to trial. You had four attempts by the prosecutor in that case to elicit testimony about Mr. Hill's post-Miranda silence. Then you had closing argument on that, and you had a prosecutor being held in contempt afterwards for violating the court's instruction. Plus, and I think this was key, the evidence was weak. Mr. Hill was the only defense witness, and this court found that all of those circumstances, it undermined his credibility. That's why the court found that the error met the Brecht standard. Here, you have approximately 20 witnesses presented on behalf of Mr. Al-Amin challenging the state's evidence. And the district court read the evidence in that light, even including, which we submit went far afield, the testimony that Mr. Al-Amin proffered in his state collateral attack. Cullen v. Penholster says, the court is to look at the record that was before the state court when it decided the issue. But even with the benefit of Mr. Al-Amin's state habeas testimony, the district court still concluded that the evidence in this case was weighty. I'm very troubled by the evidence that both deputies said that they shot the shooter multiple times, and then there's no evidence that Mr. Al-Amin was shot. What they said, Your Honor, is I shot him, I think I shot him. There was never a definitive statement attributed to either deputy that, yes, I shot him. Well, they said, I think I shot him, I think I shot him, and they shot him multiple times. One said they thought they hit him in the chest or the head. That's pretty strong evidence. Well, you also have a situation. You've got the fact that he did have body armor when he was found. Mr. Garrett said there was no damage to the vest and there was no bruising to the body. Is that in evidence? There was nothing to indicate that Mr. Al-Amin was wounded, but his car had eight bullet holes in it. The bullet fragments and the projectile recovered from the car were fired from the deputy's gun, and I would point out that he has brought up the fact that the state's firearms expert was subsequently fired in 2009, seven years after this trial, but Mr. Al-Amin had his own independent ballistics expert. That is clear from the pretrial proceedings. That expert was not called at trial to dispute what the state's expert said. What about this evidence that there was a report of a wounded man on a 911 call? That came approximately 30 minutes after, if memory serves, that came approximately 30 minutes after the shooting began. Deputy English, the surviving deputy, had immediately gotten on his radio and said, this car is fleeing right now, the black car. I think it's a Mercedes. Damian Gordon, who was the one neighborhood witness who testified for the state, said even though he said it was a Cadillac, he said it was a big boxy black car. I saw it speeding away. I thought there was evidence that there was potentially another man, whom I'm assuming the defense is saying could have been the shooter, who was wounded. There was a suggestion of that. There was a call about that. There was actually, Your Honor, there were several. This is part of the defense evidence, and the jury got to hear all this and weigh the evidence as to whether the deputy's identifications of the shooter, because both Deputy Kinchin and Deputy English identified the shooter as a man approximately 6'4", 6'5", wearing either a tan or brown trench coat or robe-looking garment who got out of the car. The person who got out of the car is who they engaged in gunfire with. That car had their bullets in it, and to go back to your question, it may well have been they thought they were shooting him. Those bullets could have readily lodged in the car itself because there were eight bullet holes found in his car. Shells that were recovered at the crime scene, the 9mm and the .223mm, were shown to have been fired from the two weapons that were recovered in Alabama along with Mr. Al-Amin's other possessions. That was what convinced the court, the district court in this case, that the evidence was weighty. Now, one of the officers who said, I shot him, I think I shot him, was that Kinchin or English? They both said something along those lines, Your Honor. But one of them was on morphine at the time, right? And morphine, there was testimony from the surgeon who treated Deputy English, the second surgeon who testified, the trauma surgeon, that morphine is simply an analgesic, I think, which is more in the nature of aspirin. It's a painkiller. It's not like other pain medications, which can blur, cause drowsiness. But he said it's just simply an analgesic, but it's strong. It's given for pain. The other medications were simply antibiotics because of the wounds and I think maybe something that would have altered his mental faculties. All right. There was a lot of physical evidence now, but the strongest evidence was the in-court identification by Deputy English? Yes, Your Honor. Absolutely. And the Georgia Supreme Court, going back to its analysis, we have never conceded, and I think a fair reading of their analysis of the issue on appeal, there was no mention of the Jackson v. Virginia reasonable doubt standard looking at the like most favorable to the state. Wasn't there another witness? I think his name was Shaka, who testified that he was absolutely positive that Alamine was not the shooter. And the description, Your Honor, of him, again, this is all fodder for the jury to reject or credit, and the testimony of the person he saw easily fit the description of Deputy Kinchin, a man roughly 5'9", wearing a brownish shirt, standing there firing a weapon. As a matter of fact, the prosecutor asserted that in his second closing argument at the trial itself. Again, the comments of the prosecutor in this case did nothing to undermine the defense that Mr. Alamine put up. But you would agree with me that the comments were pretty egregious. They were egregious. Even in the eyes of the Georgia Supreme Court, there was a constitutional violation. The point is, Your Honor, that no court has said they were not. The point is they have found to violate the Fifth Amendment. That, without more, is not good enough under current Supreme Court precedent. I just don't know how you stop prosecutors from violating a defendant's constitutional rights when they have enough other evidence in the case to convict the defendant. That just doesn't seem right to me. With all due respect, Your Honor, again, we're not here simply on a claim of prosecutorial misconduct. We're here on a claim of whether Mr. Alamine's Fifth Amendment rights were violated and whether an argument may be offensive is not enough under current precedent. Would it be enough if there was a claim in this case of prosecutorial misconduct? Is that what defendants in the future should raise as an issue when a prosecutor deliberately and egregiously violates a defendant's Fifth Amendment right not to testify? That may well be a better avenue or vehicle for such a claim, Your Honor. But we know that in Georgia there is no cumulative error doctrine, and to couple the two together is not something that the Supreme Court currently recognizes as well. All right. You want to touch on the Sixth Amendment? On the Sixth Amendment claim, Your Honor, if you look at the brief that Mr. Alamine filed on direct appeal,  looking at document 36-1 at page 72, no Supreme Court cases on Sixth Amendment from the United States Supreme Court were cited. All he cited as authority for being able to inquire into this similar transaction evidence was United States v. Cohen, which involved an application of Rule 404B, which is a federal rule of evidence. It is not binding on the state courts. And to argue today that the Georgia court was somehow bound by a federal rule of evidence, which was not the law in the Georgia at the time, doesn't translate into a Sixth Amendment violation. Again, we're not even talking about there were no U.S. Supreme Court cases cited by Mr. Alamine on appeal as the restriction. And as we've already discussed this morning, under Georgia law, you can't get into specific acts of bad character unless there's a conviction of moral turpitude. Even that, the district court, in evaluating this and concluding that the Georgia Supreme Court's decision warranted deference, looked at it from a federal standpoint, a 404B case, and found there was no good faith basis to have asked such a question because this is all speculative as to what Agent Campbell may or may not have done in a prior incident. And again, there's been no assertion that there was ever a conviction of Agent Campbell and just certainly no basis and no substantive evidence. And the magistrate judge, although her report and recommendation was not accepted because of the objections in the de novo review, pointed out the minimal role, not the key role, the minimal role that Agent Campbell played. He was simply part of the team that went to Whitehall attempting to apprehend Mr. Alamine. He was out with the dog handlers. He did not find the guns. They were found by other individuals. I think the handgun was found that night when they went back out. It was so dark they went back out the next morning and found the other weapon. Neither were found by Agent Campbell. And as the district judge pointed out, how could he have gotten those and planted them in Alabama? It was sheer speculation. If there are no further questions, we would urge you to affirm. Thank you. Thank you, Ms. Smith. And Mr. Garrett, you reserve some time for rebuttal. Yes, Your Honor. I have a lot to say, and of course I want to welcome any questions, but to go as quickly as I can. There was a lot of talk about the blood evidence, and absolutely. The evidence, the assailant was shot, the blood trail that the prosecution used to then get a warrant to search Mr. Alamine's store, I mean, that is compelling evidence. But there's a lot more. Analysis of that blood? Was there any analysis of that blood evidence? It was contaminated, ultimately. It was inconclusive. There was so much foot traffic in the area. Some of the blood samples were taken from leaves. The leaves degraded too quickly. I mean, do we even know it was human blood, I guess is what I should have been more clear with. The point is, according to the prosecution, by the time the blood was tested, it was impossible to even determine whether it was human blood. Nevertheless, there was a blood trail denied the crime that was used to get a warrant for his store. You already touched on the eyewitness testimony of Mr. Shaka. The gray eyes, that's a point that I do not want to be overlooked. In fact, looking back through the cross-examination of Mr. English, which the court has focused on, beyond the statements that the assailant had been shot, he really held firm to the gray eyes testimony, both in the cross and in the recross. The prosecution knew it had a problem with it, as shown by the redirect and then an attempt to further redirect. Deputy English, he stood by his testimony that the assailant had gray eyes. I looked him in the eyes, and I'll never forget those eyes, those gray eyes. And furthermore— Wilma Smith points out that the jury heard these arguments. The jury can reject these arguments. What's your response to that? That's correct. The question is, could the jury have acquitted him? And could this constitutional error that we all agree is egregious and deliberate and really highly unusual? I mean, it's an unusual habeas case. We've got a constitutional error. Everybody agrees it's egregious. Could that have impacted this jury? And the district court said, look, if I was just looking at the crime scene evidence, I would have grave doubt. And she said, but you know what? I'm going to put that out of my mind, and I'm going to pretend that this case is just on the Alabama evidence. So is your position that this is the exceptional case that the Brecht court dropped a reference to in footnote 9 when it said, our holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type or one that is combined with a pattern of prosecutorial misconduct might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict? We do, in fact, embrace the footnote. I think this case fits that footnote. It's rarely addressed. The dissent thought that this was going to breed a number of habeas cases. It hasn't. Very few cases have really dealt with whether you have that unusual fact pattern. We have that unusual fact pattern. But I respectfully submit that under a proper application of Brecht, this error could not be dismissed as harmless. You're getting on the verge of creating the same error the Georgia Supreme Court has been committing, where as long as there's evidence sufficient to convict, that nothing matters. It doesn't matter what the error is. You can excuse everything. And look at what Justice Hunstein said in her repeated dissents when the Georgia Supreme Court was doing it wrong. This gives no disincentive because you say whatever you do, we're going to excuse any prosecutorial misconduct, any egregious error as long as there's sufficient evidence to convict. That can't be the standard or there's no policing of any errors whatsoever. I'm happy to present supplemental briefing if the court would like it. Again, I want to note, mishmash of inconsistencies, mixed bag. That's the way the district court described the crime scene evidence. That would have been sufficient for the jury to have acquitted him. And there's also the importance of closing arguments. Several decisions have emphasized that's the end of the case right before the jury goes back there. That's why it's highly important to police errors during closing arguments. Thank you very much. The case was very well argued. Thank you. Thank you. Thank you both. Thank you.